AFFIDAVIT IN SUPPORT OF A

CRIMINAL COMPLAINT AND ARREST WARRANT

This affidavit is being submitted by the affiant, Special Agent S. R. Miller, in support of a criminal complaint and application for an arrest warrant relating to **KAMRAN RAVANASA,** also known as **KEVIN RWANT**, REDACTED Canadian Passport Number REDACTED

I, S. R. Miller, being duly sworn, hereby depose and state as follows:

There is probable cause to believe that the above-identified individual has committed the following criminal offenses in violation of United States law: (1) unlawfully and willfully exporting and causing the export of goods from the United States to Iran without the required U.S. Department of Treasury licenses, as well as attempting and conspiring to do the same, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705; the Iranian Transactions Regulations, Title 31, United States Code of Federal Regulations, Part 560; and Title 18, United States Code, Sections 371 and 2; and (2) making or causing to be made a false statement or representation, in violation of Title 18, United States Code, Sections 1001 and 2.

### AFFIANT'S BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent with the FBI for a little over one and one half years and am presently assigned to the Washington Field Office. My training and employment with the FBI has vested me with the authority to investigate violations of federal laws. In the course of my duties, I am responsible for investigating matters that relate to the national security of the United States. Prior to being a Special Agent with the FBI, I served for over five years as a civil engineer with the Federal

Emergency Management Agency.

**2.**     As a result of my training and experience, I am familiar with federal laws and regulations governing the export of goods and technology from the United States, including the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701–1706, and the Iranian Transactions Regulations, Title 31, United States Code of Federal Regulations , Part 560. I am also familiar with Title 18, United States Code, Section 1001.

**3.**     The statements contained in this affidavit are based on information I have learned through my personal participation in this investigation, from oral and written reports of other law enforcement officers, from records, documents, and other evidence obtained during this investigation, and from my experience and training as a Special Agent.  Since this affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant has committed the charged offenses.

## SUMMARY OF THE LAW AND REGULATIONS.

**4.**     Pursuant to the authority under the International Emergency Economic Powers Act ("IEEPA"), the President of the United States and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S. goods.  From March 9, 2006, until October 15, 2007, IEEPA, Title 50, United States Code, Section 1705(b), provided as follows:

> Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than twenty years, or both; and any

> officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.

On October 15, 2007, IEEPA was amended to include a conspiracy provision and an increased fine. Subsections (a) and (c) of the amended statute provide as follows:

> (a) Unlawful Acts. – It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title.
>
> * * *
>
> (c) Criminal penalty. – A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.

5. Pursuant to the Executive Order by President William Jefferson Clinton in 1995, the Secretary of the U.S. Department of Treasury, in consultation with the Secretary of State, promulgated the Iranian Transactions Regulations, Title 31, United States Code of Federal Regulations, Part 560. The Iranian Transactions Regulations generally prohibit any person from exporting or causing to be exported from the United States without a license any good or technology without having first obtained a validated export license from the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia.

6. The Iranian Transactions Regulations impose, among others, the following prohibition set forth in Section 560.204 - Prohibition of any Sale or Supply of any Goods, Technology, Services to Iran or the Iranian Government:

> Except as otherwise authorized [by a license issued by the Office

of Foreign Assets Control of the U.S. Department of Treasury (OFAC)], the exportation,…sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited.…

7. Title 18, United States Code, Section 1001(a), prohibits knowingly and willfully "mak[ing] any materially false, fictitious, or fraudulent statement or representation" in any matter within the jurisdiction of any branch of the United States government.

## SUMMARY OF PROBABLE CAUSE

### Background of Defendant

8. **KAMRAN RAVANASA**, also known as **KEVIN RWANT** (hereinafter "**RAVANASA**"), is a foreign national who holds dual citizenship in both Canada and Iran. **RAVANASA** represents himself as the general manager and managing director of New Generation International Trading, L.L.C. ("New Generation"), a trading company located in Dubai, United Arab Emirates.  **RAVANASA** also represents himself as general manager of Barsum Trading Company, also known as Barsam-Kish Commercial Company (hereinafter "Barsum"), a trading company located in Kish Island, Iran, as well as managing director of New Open Computing Company ("NEWOCC"), a trading company in Tehran, Iran.

### Summary of Investigation

9. The U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), the FBI, and the U.S. Department of Commerce, Office of Export Enforcement ("OEE"), are conducting a joint investigation involving the export and attempted export of U.S. origin goods to Iran.

10. The investigation has revealed that **RAVANASA** has been working on behalf of the

manager of an Iranian trading company (hereinafter "Individual A") who, in or about October 2007, was placed by the U.S. Department of Commerce on the Denied Party List, a list of individuals and entities with whom it is unlawful for U.S. companies to do business. Individual A is believed to assist in the procurement of U.S. origin goods for an Iranian Government entity affiliated with the Iranian military (hereinafter "Iranian Government entity").

11. The investigation has also revealed that **RAVANASA**, who has acted as a procurement broker and supplier, knowingly caused the export of U.S. origin goods from a variety of U.S. companies, primarily in the aviation, aerospace, and related fields, to Iranian end users.

12. At no time did **RAVANASA** or any of the entities and individuals affiliated with **RAVANASA**, apply for, receive, or possess a license or authorization from the Office of Foreign Assets Control to export goods, technology, or services, of any description, to Iran.

**A. Export and Attempted Export of U.S.-Origin Parachute Equipment to Iran**

13. Between in or about May 2007 and in or about April 2009, **RAVANASA** attempted to cause the export of U.S.-origin parachute-related materials and fabrics worth a total value of approximately $151,111.20 to Iran. The materials included, among other things, Zero Porosity Nylon Ripstop Fabric, Javelin Reserve pilot chutes, and Separable Link Drag Chutes, all of which have been identified as components of civilian and military high altitude airborne operations. Ultimately, **RAVANASA** caused the export of approximately $5,068.00 worth of parachute-related materials to Iran via Malaysia.

14. Between in or about May 2007 and in or about July 2007, Individual A contacted **RAVANASA** to inquire about obtaining parachute-related materials and fabrics from a parachute equipment company located in Illinois (hereinafter "Illinois company").

15.     In or about August 2007, after having received a purchase order from Individual A, **RAVANASA** contacted the Illinois company to obtain a quote for the parachute equipment specified by Individual A.

16.     On or about August 31, 2007, the Illinois company issued a quote of $151,111.20 to **RAVANASA** for approximately thirty line items of parachute equipment in varying quantities. **RAVANASA** continued to communicate with representatives of the Illinois company about the terms and specifications of the order between in or about August 2007 and in or about May 2008.

17.     On or about January 11, 2008, a representative of the Iranian Government entity entered into a written contract with **RAVANASA** for the purchase of fabric and parachute supplies made by the named Illinois company.  The total amount specified by the contract was 196,643.58 Euros.

18.     On or about May 19, 2008, **RAVANASA** caused $50,773.60 to be transferred to the Illinois company's U.S. bank in partial payment for the ordered parachute equipment.

19.     In or about June 2008, an ICE undercover company ("Undercover Company") was introduced to **RAVANASA** as the transferred U.S. source supplier for the ordered parachute equipment, thereby removing the Illinois company from the transaction.

20.     On or about July 15, 2008, **RAVANASA** submitted to the Undercover Company a "Form BIS-711" entitled "Statement By Ultimate Consignee and Purchaser" (hereinafter "Form 711"). Form 711 is an official document of the U.S. Department of Commerce, which is headquartered in the District of Columbia.  **RAVANASA** represented on the form that he was the general manager of NGIT in Dubai, United Arab Emirates ("UAE"), his company was "investing on air sports and tourism entertainments," and that the goods would not be reexported from the UAE.

**RAVANASA** signed Form 711 underneath the following language:

> We certify that all of the facts contained in this statement are true and correct to the best of our knowledge and we do not know of any additional facts which are inconsistent with the above statement. We shall promptly send a supplemental statement to the U.S. Exporter, disclosing any change of facts or intentions set forth in this statement which occurs after the statement has been prepared and forwarded, except as specifically authorized by the U.S. Export Administration Regulations . . . or by prior written approval of the Bureau of Industry and Security, we will not reexport, resell, or otherwise dispose of any items approved on a license supported by this statement (1) to any country not approved for export . . . or (2) to any person if we know that it will result directly or indirectly, in disposition of the items contrary to the representations made in this statement or contrary to Export Administration Regulations.

21.   On or about December 15, 2008, the Undercover Company had a conversation with **RAVANASA**, during which the Undercover Company told **RAVANASA** that it suspected that the parachute equipment was being shipped to Iran. In response to this statement, **RAVANASA** informed the Undercover Company that this was not true and that **RAVANASA** was located in Dubai and that the goods would be shipped only to Dubai.

22.   On or about December 17, 2008, **RAVANASA** instructed the Undercover Company to send the parachute equipment to a Malaysian company, Free International Trading Sdn. Bhd. ("FIT Company"), whom he identified as the new consignee of the products.

23.   On or about January 6, 2009, the managing director of FIT Company completed and signed a Form 711. The executed Form 711 stated that the parachute equipment would be resold in Malaysia for "use or consumption therein," specifically for "producing kites for entertainment."

24.   On or about January 16, 2009, the Undercover Company advised FIT Company of the

approximate delivery date and cost of the order and requested guidance on the method of payment. After having received this communication from the Undercover Company, on or about January 17, 2009, FIT Company forwarded this information to **RAVANASA**, providing him with the tentative delivery date and quoted price of the shipping.

25. On or about January 20, 2009, FIT Company informed **RAVANASA** that arrangements had been made with the Iran Air office to forward the items to Imam Khomeini International Airport ("IKIA") located in Tehran, Iran.

26. On or about January 23, 2009, the Undercover Company informed FIT Company that U.S. authorities had detained the shipment, which was destined for Malaysia. Upon receiving this news, on or about January 24, 2009, **RAVANASA** told the Undercover Company representative that it was his understanding that the Undercover Company had gotten "all needed permits before shipping," later instructing the Undercover Company to cancel the order. In subsequent communications between on or about January 24, 2009, and on or about February 1, 2009, **RAVANASA** discussed a possible new customer in Europe where the parachute equipment could be shipped, asking about the need of any "export license" to Europe, and stating that it was important to him that everything was "legal."

27. The Undercover Company resumed communications with **RAVANASA** in or about April 2009, and **RAVANASA** expressed his commitment to acquiring the parachute equipment that had previously been ordered.

28. On or about April 13, 2009, the Undercover Company shipped two of the ordered items, with a value of $1,975.00, to FIT Company at its address in Malaysia via Federal Express (FedEx Air Waybill number 865716386284) in accordance with instructions from **RAVANASA.**

**29.** On or about April 14, 2009, **RAVANASA** sent an e-mail to a representative of FIT Company stating, "I have a small shipment on its way to you via FedEx number 865716386284. It is scheduled for delivery on the 20th. I have attached the packing list for your review." Attached to the e-mail was an invoice provided to **RAVANASA** by the Undercover Company.

**30.** On or about April 15, 2009, a FIT company representative sent an e-mail in response to **RAVANASA** that said: "Thanking you for your kind e-mail. We will take care of the job. Kindly provide us the destination address and also kindly inform us about the dimension & weight of the package enabling us to get the quotation from Iran Air."

**31.** On or about April 21, 2009, the FIT Company representative sent an e-mail to **RAVANASA** notifying him that the package would arrive the next day in Tehran and attaching an Iran Air invoice quoting the price of shipping the product to Iran.

**32.** On or about April 21, 2009, **RAVANASA** contacted the Undercover Company and confirmed that FIT Company had received the first shipment and that the Undercover Company should send the remainder of the items.

**33.** On or about April 24, 2009, the Undercover Company shipped four of the ordered items, with a value of $ 3,093.00, to FIT Company at its address in Malaysia via Federal Express (FedEx Air Waybill number 865870069342).

### B. Export of U.S.-Origin Aircraft Antennas to Iran

**34.** Between in or about June 2005 and in or about November 2005, **RAVANASA** also caused the export of GPS aircraft guidance antennas distributed by a California company to Individual A's trading company (hereinafter "Iranian trading company") in Tehran, Iran. These antennas assist aircrafts in guidance and navigation. **RAVANASA** received orders from the

Iranian trading company, and by using an associate in a Canadian company (hereafter "Canadian Front Company"), caused a U.S. distributor of the aircraft antennas to export $40,350.00 worth of these goods to Iran through the UAE.

35.     In or about October 2004, the associate at the Canadian Front Company informed **RAVANASA** that he had found a solution to their back-to-back letter of credit problem, having spoken to bankers in Canada. He suggested to **RAVANASA** that they use instead a letter of credit that is transferrable to another person or company and advised that using this method, the banks could "hide the original information from the seller to protect the middle man and also protect the profits." He also advised **RAVANASA** that he should get someone in Dubai to handle their business and requests.

36.     On or about June 19, 2005, **RAVANASA** contacted a manager of the Iranian trading company (hereinafter "Individual B") and requested that Individual B revise a May 16, 2005, pro forma invoice for 150 "LI Aircraft Antenna (103062) for DG 14" to reflect a reduced price of $650.00 per unit from $950.00 per unit.

37.     On or about June 20, 2005, the associate from the Canadian Front Company sent an e-mail to **RAVANASA** with a June 16, 2005, quote from the California company for 100 aircraft antennas at $296.00 each.

38.     On or about June 21, 2005, Individual B sent to **RAVANASA** a revised pro forma invoice reflecting the requested changed price for the 150 aircraft antennas and instructing that the shipment of the goods should go through Dubai, UAE, to Tehran, Iran, through Mehrabad Airport. The pro forma invoice was addressed to the Iranian trading company in Tehran, Iran, but was on the letterhead of a company in Singapore.

**39.**     On or about July 27, 2005, the California company issued a purchase order acknowledgment for purchase number "XPO-AT-715-A1" to the Canadian Front Company for 150 aircraft antennas at $269.00 each, with a ship-to address of a Dubai, UAE, company located on Bank Street, Bur Dubai. The anticipated delivery of the 150 aircraft antennas was listed as September 7, 2005.

**40.**     In or about July or August 2005, **RAVANASA** caused a payment of $40,350.00 to be made to the California company in full payment for the aircraft antennas.

**41.**     On or about August 25, 2005, **RAVANASA** received from his associate at the Canadian Front Company a forwarded message seeking confirmation that, among other things, U.S.-origin GPS technology could not be exported or reexported to Iran.

**42.**     On or about September 1, 2005, the California company shipped the aircraft antennas to the Canadian Front Company at the same Bank Street, Bur Dubai address in Dubai, UAE, previously specified in the July 27, 2005, purchase order acknowledgment as being the address of a company with a different name.   The Shipper's Export Declaration that **RAVANASA** caused to be submitted to the U.S. Department of Commerce for this product identified the "country of ultimate destination" as the UAE and the ultimate consignee as the Canadian Front Company.

**43.**     On or about November 2, 2005, Individual B provided **RAVANASA** with a transferrable letter of credit (a/k/a "L/C") from Bank Sepah in Tehran for the 150 aircraft antennas.  The letter of credit was issued by Bank Sepah on behalf of the Singapore company to the Iranian trading company.  In line 45A of the letter of credit under "Description of Goods," it read: 150 units of "LI Aircraft Antenna (103062) for DG 14" at $650.00 each, and the product shipment route specified was from Dubai, UAE, to the Mehrabad Airport located in Iran.

**44.**     On or about November 21, 2005, the Canadian Front Company sent to **RAVANASA** the purchase order acknowledgment for purchase order number "XPO-AT-715-A1" for the aircraft antennas.

**45.**     On or about November 24, 2005, Individual B provided **RAVANASA** with documents for partial shipment to the Iranian trading company.  The documents included 1) a "Certificate of Origin" from the Singapore company for the export from Dubai, UAE, to Bank Sepah at Tehran, Mehrabad Airport, of 150 units of "LI Aircraft Antennae (103062) for DG 14" and noting "Shipment from Dubai/U.A.E. on CPT Basis to Tehran Mehrabad Airport"; 2) an air waybill issued by Iran Air for shipment from Dubai to Tehran of 150 units of "LI Aircraft Antenna (103062) for DG 14" by the Singapore company to Bank Sepah; 3) Packing List No. 1445 from the Singapore company to the Iranian trading company in Tehran, Iran, for 150 units of "LI Aircraft Antenna (103062) for DG 14" representing that the goods originated in France; and 4) a Freight Invoice from an agent for Iran Air for the 150 units of "LI Aircraft Antenna (103062) for DG 14" listing the consignor as the Singapore company, the consignee as Bank Sepah, the notifying party as the Iranian trading company, and noting the airport of loading was Dubai, UAE, and the airport of delivery of Tehran Mehrabad Airport, Tehran, Iran.

## **CONCLUSION**

**46.** Based on the facts set forth herein, and on my experience and training in investigating cases involving violations of federal law, I submit there is probable cause to believe that **KAMRAN RAVANASA**, also known as **KEVIN RWANT**, has committed the following offenses: (1) unlawfully and willfully exporting and causing the export of goods from the United States to Iran without the required U.S. Department of Treasury licenses, as well as attempting and conspiring to do the same, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705; the Iranian Transactions Regulations, Title 31, United States Code of Federal Regulations, Part 560; and Title 18, United States Code, Sections 2 and 371; and (2) making or causing to be made a false statement or representation, in violation of Title 18, United States Code, Sections 2 and 1001.

```
                               _____
                               S. R. MILLER, SPECIAL AGENT
                               FEDERAL BUREAU OF INVESTIGATION
```

Subscribed to and sworn before me on this _____ day of June, 2009

_____
UNITED STATES MAGISTRATE JUDGE